ANDERSON COUNTY ROAD DISTRICT NO. 8 ET AL. V. CLAUDE
POLLARD, ATTORNEY-GENERAL.

No. 4771.   Decided June 4, 1927.

(296 S. W., 1062).

**1.—Constitutional Law—Validating Acts.**

What the Legislature could have authorized in the first instance it can
ratify if at the time of the ratification it has the initial authority to
authorize.   (Pp. 554, 555).

**2.—Same—Road Improvement District—Creation of Debt.**

Though the creation of a road district, the authorization by vote of
taxpayers of the issuance of its bonds and the levying of taxation to meet
them, were invalid because done by local authorities without due legisla-
tive authority, and had already been so held by the courts, the Legislature,
if possessed of the power to authorize such proceedings, could legalize them
by a validating Act.   Such creation of the district and consent of the tax-
payers, though not lawfully given at the time, could be made the basis of
validation and was not illegal as constituting the creation of a debt against
the district without the consent of its taxpayers required by the Con-
stitution.   (Pp. 554-564).

**3.—Road Improvement District—Issue of Bonds—Validating Act.**

The special validating Acts relating to bonds issued by the Anderson
County Road District No. 8 (Special Laws, 39th Leg., First Called Session,
Chap. 52, p. 164, Act of October 13, 1926) and the general validating Acts
of the same session (Act of October 13, 1926, General Laws, 39th Leg.,
First Called Session, Chap. 10, p. 16, and Act of October 18, 1926, Chap.
17, p. 33) are examined and held to make valid certain bonds previously
issued but not sold by such district.   Mandamus here issues against the
Attorney-General requiring him to approve same as preliminary to their
sale.   (Pp. 554-564).

**4.—Cases Discussed.**

Authorities on the office and effect of validating statutes are reviewed.
Tom Green County v. Moody, 116 Texas, 299, is followed.   The Acts here
considered are held to validate the issuance of the bonds here in question,
despite the rulings in Browning v. Hooper, 169 U. S., 396, 70 L. Ed., 153,
made before their enactment.   (Pp. 554-564).

Original application to the Supreme Court by Anderson County
Road District No. 8 and others for writ of mandamus against
Pollard as Attorney-General.

*W. R. Petty, E. V. Swift* and *W. P. Dumas;* for relators, cited:
Special Laws, 39th Leg., First Called Session, Chap. 52; General
Laws, 39th Leg., First Called Session, Chap. 10, Chap. 17; Con-
stitution, Art. 3, Sec. 52, as amended in 1904; Charlotte Harbor
& N. R. Co. v. Wells, 260 U. S., 11; Kansas City S. R. Co. v.
Road Imp. District No. 3, 266 U. S., 379; People v. Weis, 275

Ill., 581; People v. Stitt, 280 Ill., 553; People v. Woodruff, 280 Ill., 472; People v. Madison, 280 Ill., 96; People v. Dix, 280 Ill., 158; People v. Fifer, 280 Ill., 506; Dunn v. Fort Bend County, U. S. C. C., Galveston, Jan. 8, 1927; Tom Green County v. Moody, 116 Texas, 299; Nolan County v. State, 83 Texas, 182.

*Claude Pollard,* Attorney-General, *in pro. per.*

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

This is a mandamus proceeding brought by Anderson County Road District No. 8, the County Judge and County Commissioners of Anderson County against the Attorney-General, for the purpose of requiring him to approve $500,000 of road bonds previously voted by the electors of the road district at an election held for the purpose. Anderson County Road District No. 8 was created by order of the Commissioners Court on the 13th of October, 1922, under authority of the Constitution and laws of the State, particularly Sec. 52, Art. 3, of the Constitution, Chap. 2, Title 18, Revised Statutes of 1911, as amended by Chap. 203, Acts of 1917, Regular Session, and Chap. 18, Acts Fourth Called Session of the Thirty-fifth Legislature, Chap. 38, Acts of the Second Called Session of the Thirty-sixth Legislature, and Chap. 41, Acts of 1921. In other words, the district was created under the road district laws of the State providing for the creation of districts by County Commissioners' Courts and the issuance of bonds by vote of the electors. The election was petitioned for by the voters, as provided by the statute, ordered by the Commissioners Court, and held on the 21st of November, 1922, for the purpose of determining whether or not the bonds of Road District No. 8 should be issued in the total principal sum of $1,500,000. No question is made but that the statute in all respects was complied with in all proceedings leading up to the election, nor is any question made but that the bonds were voted by the required constitutional and statutory majority. In due course all the bonds authorized by the election were issued, and, after approval by the Attorney-General, sold or otherwise lawfully disposed of, save and except $500,000 thereof. This action was brought to require the Attorney-General to approve the record as provided by law as to the issuance of the last installment of $500,000 in bonds previously voted, as above stated. The Attorney-General has refused to approve the bond record, for reasons stated by him in his answer,

to the effect that the Supreme Court of the United States in the case of Browning v. Hooper (known as the Archer County case) had declared the law under which the bonds were issued repugnant to the due process clause of the Federal Constitution, and that the Legislature was without power to validate them as it had attempted to do in the statutes hereafter noted.

After the decision of the Supreme Court of the United States in the case of Browning v. Hooper, United States Reports, 70 Law Ed., p. 153, the Legislature was convened in special session by the Governor, for the purpose, among others, of passing necessary and proper legislation to validate and legalize State, county, commissioners' precinct, and special road district bonds or securities, whose validity had been brought in question by the decision in the Browning case, and to cure defects in the issuance of such bonds or securities, etc. Tom Green County v. Moody, 289 S. W., 381. At this special session of the Legislature an Act was passed and approved by the Governor, validating the creation of Road District No. 8 of Anderson County, and validating all proceedings leading up to the issuance of the bonds here in controversy, and their issuance as well. The first and second sections of this validating Act read as follows:

"Section 1. That Road District No. 8 of Anderson County, Texas, including within its limits the territory described and defined in that certain order of the Commissioners Court of Anderson County, Texas, passed and adopted by said court on the 13th day of October, 1922, recorded in Book 19, page 292 *et seq.*, minutes of the Commissioners Court of said county, a certified copy of which order is on file in the office of the State Comptroller of Public Accounts, is hereby created and established as a defined road district in said county, under authority of Sec. 52 of Art. 3 of the Constitution of the State of Texas, with like effect as though the metes and bounds description thereof appeared herein, for the purpose of constructing, maintaining and operating macadamized, graveled, or paved roads and turnpikes, or in aid thereof, and such district is hereby made a body corporate and taxing district under the Constitution and laws of the State of Texas.

"Sec. 2. That the organization and establishment of said Road District No. 8 of Anderson County, Texas, by the Commissioners Court of said county is hereby approved, ratified and confirmed, and the power and authority of said Commissioners Court to create said territory into a separate road district and taxing district for the purpose of issuing bonds for purchasing roads from other districts, and further constructing, maintain-

ing and operating macadamized, graveled, or paved roads and turnpikes, or in aid thereof, and to levy and collect annually a direct general ad valorem tax upon all of the taxable property therein appearing upon the assessment rolls for State and county taxes, in payment of such bonds, be and the same is hereby delegated, ratified, approved and confirmed."

The third section copied the order of the Commissioners Court made in ordering the election at which these bonds were voted *haec verba*, and declared that this order, which authorized the issuance of the bonds in controversy and the levy of a tax for their payment, etc., the notices of the election, the form of ballot used, the canvass of votes, the declaration of result, etc., are "hereby legalized, approved, and validated."

Secs. 4, 5, 6, 7, and 8 relate to bonds which have been heretofore issued and disposed of, but voted at the same time and as a part of the same issue as the bonds here involved. Those which were previously issued and disposed of were validated by the Act, and were declared valid and binding obligations of the district, and in all things relative to their issuance legalized and validated.

Sec. 9 legalized and validated the levy of taxes, expressly delegating to the Commissioners Court the power to continue to levy taxes for the purpose of maturing the bonds.

Secs. 10, 11 and 12 relate directly to the bonds in issue in this proceeding. These sections read as follows:

"Sec. 10. That, whereas, there now remains unissued and unsold bonds in the sum of five hundred thousand dollars ($500,-000) of the said total authorized issue voted at the election held in said Road District No. 8, on the 21st day of November, 1922, and, whereas, the Commissioners Court of said county by the said order of February 8, 1925, expressly reserved the right to thereafter issue the said unissued bonds aggregating said five hundred thousand dollars ($500,000), in addition to the bonds that had been theretofore issued, and it is further enacted that the said unissued bonds shall be issued and delivered after approval thereof by the Attorney-General of the State of Texas, and registration thereof by the State Comptroller of Public Accounts, and the said order of the County Commissioners Court reserving the right to issue such additional bonds is hereby approved and confirmed, and power and authority is hereby expressly conferred upon the said court to adopt all orders and to do all acts necessary in the issuance and sale of such unissued bonds, and the said court is hereby expressly authorized and empowered to levy a direct general ad valorem tax upon all

taxable property in said road district, in addition to taxes heretofore levied for and on behalf of said district, for the purpose of paying the interest on and principal of the said unissued bonds, and which such taxes shall be levied, and proper provision made for their assessment and collection, in all things as provided by law.

"Sec. 11.     That said orders, and all other orders adopted by said County Commissioners Court in respect of said road district, bonds and taxes, as the same appears upon the records of said court, or copies thereof duly certified, are hereby constituted legal evidence of such orders, and shall be authority for said court to annually levy, assess and collect taxes in an amount sufficient to pay the principal of and interest upon said bonds as the same mature and become due, such taxes to be levied and assessed upon the value of taxable property in said road district as fixed for State and county taxes, and that any and all acts and proceedings had and taken by said court in the construction of roads and turnpikes from the proceeds of said bonds are hereby validated, approved and legalized.

"Sec. 12.     That the Legislature hereby exercises the authority upon it conferred by Sec. 52, of Art. 3, of the Texas Constitution, and declares said defined district as a road district, as above described, to have been legal and valid from the date of the adoption of said order, defining its boundaries, and confirms and ratifies said acts and proceedings of said court in respect of said election authorizing the issuance and sale of said bonds, and levy of taxes to pay principal thereof and interest thereon and the construction of roads and turupikes with the proceeds thereof with like effect as though at the time or times said acts and proceedings were done or had, there existed statutory authority for the doing thereof, and the bonds of said district that have not been issued and sold, having been voted by the necessary majority of the qualified electors in conformity with the provisions and requirements of said Sec. 52, of Art. 3, of the Constitution, shall be the valid and binding obligations of said Road District No. 8, upon their issuance and sale under the provisions of this Act."

In addition to the foregoing, the same session of the Legislature passed a general law, Chap. 10 of the General Laws of the First Called Session of the Thirty-ninth Legislature, having for its object the validating of all road bonds theretofore voted by any political subdivision or Road District under Sec. 52, Art. 3, of the Constitution, and which bonds had not theretofore been issued and sold.    Sec. 1 of this Act reads as follows:

"Section 1.   That all road bonds heretofore voted and authorized by any political subdivision, or by any road district, in accordance with the provisions and requirements of Sec. 52, of Art. 3, of the Texas Constitution, and which bonds have not yet been issued and sold, are hereby validated, and the Commissioners Court of the county including such political subdivision or road district, shall have the power, and is hereby expressly authorized, to make and enter any and all orders and provisions necessary for the purpose of issuing and selling the bonds so authorized to be issued by the qualified electors of such political subdivision or road district, and such court is hereby further expressly authorized to levy general ad valorem taxes on all taxable property situated in such political subdivision or road district as such taxable property appears upon the assessment rolls for State and county taxes, in amount sufficient to pay the interest on such bonds and the principal thereof at maturity, and such bonds, when approved by the Attorney-General, registered by the State Comptroller and delivered shall be the general direct and binding obligations of such political subdivision or road district issuing the same."

The same session also passed another general Act. Chap. 17, General Laws of the Thirty-ninth Legislature, First Called Session, Secs. 1, 2, 3, and 4 of which read as follows:

"Section 1.   That whenever the County Commissioners Court of any county shall have caused to be described upon its records any defined portion of contiguous territory, located wholly within such county, for the construction, maintenance and operation of macadamized, graveled, or paved roads and turnpikes, or in aid thereof, located therein, each such defined portion of contiguous territory is hereby recognized as a legal body politic and corporate of this State and as a road district for such road purposes under authority of Sec. 52, of Art. 3, of the Constitution of Texas, and the creation of each such road district is hereby validated and legalized.

"Sec. 2.   That the boundaries of each such road district are hereby designated as the same are described by metes and bounds upon the minutes or records of the County Commissioners Court of any county wherein a road district has been heretofore established pursuant to any general or special law, and such boundaries are hereby designated as the same appears upon said record books of the County Commissioners Court of the several counties in the State of Texas, and upon certified copies of such records on file in the office of the State Comptroller of Public Accounts, and with like effect as though the metes and

bounds description of each such road district was here severally set out at large.

"Sec. 3.   That where a two-thirds majority of the resident property taxpayers, being qualified electors thereof, of any such road district voting on the proposition, having voted at an election held in such road district called by the County Commissioners Court of such county, in favor of the issuance of bonds of such road district and the levy of a tax upon the taxable property therein for the purpose of paying interest on said bonds and providing a sinking fund for the redemption thereof, for the construction, maintenance and operation of macadamized, graveled, or paved roads or turnpikes, or in aid thereof, the canvass of said vote, revealing such majority, having been recorded in the minutes of said County. Commissioners Court, and where thereafter the County Commissioners Court of such county, by order adopted and recorded in its minutes, authorized the issuance of bonds of such road district, prescribed the date and maturity thereof and rate of interest the bonds were to bear, the place of payment of principal and interest, and provided for the levy of a tax upon the valuation of taxable property in such road district according to the value thereof as fixed for State and county purposes, sufficient to pay the interest on such bonds and to produce a sinking fund sufficient to pay the bonds at maturity, and said bonds were sold and delivered and the proceeds received by the county treasurer of said county for the credit of all such road district, each such election and all acts and proceedings had and taken in connection therewith by such County Commissioners Court in respect of such bonds, levy of taxes and construction of roads and turnpikes are hereby legalized, approved and validated; and such bonds so sold and delivered are hereby validated and constituted the legal obligations of such road district.

"Sec. 4.   That taxes sufficient to pay the principal of and interest upon said bonds, so levied for such purpose upon the valuation of taxable property in such road district, according to the value of taxable property as determined for State and county purposes, are hereby found and fixed as the amount to be raised in such road district, and constituted the basis for such taxation, and the assessment and levy of such taxes is hereby validated and legalized; and that said taxes, in an amount sufficient to pay the principal of and interest upon said bonds now outstanding, shall be annually assessed and collected according to the value of taxable property as fixed for State and county

taxes by the County Commissioners Court of each such county, and express authority so to do is hereby delegated and granted to such courts."

It is obvious from a reading of these special statutes that the purpose of the Legislature was to validate road districts of the character here involved, including this identical district, in all respects. The boundaries of the district as selected by the petitioners, and as defined by the Commissioners Court in its orders, the election at which the bonds were voted, all orders of the Commissioners Court, the taxes levied to pay the bonds, and all other proceedings pertaining to the creation of the district, the levy of taxes, and the issuance of bonds, are by these several Acts of the Legislature expressly ratified and validated.

By the provisions of Chap. 10, previously quoted, the Commissioners' Courts of the various counties having bonds heretofore voted but not issued, are expressly authorized to make and enter any and all orders and provisions necessary for the purpose of issuing and selling the bonds, and to levy general ad valorem taxes on all taxable property, in an amount sufficient to pay the interest on the bonds and principal at maturity. The Act then declares that said bonds, when approved by the Attorney-General and registered as required by law, shall be the general, direct and binding obligations of the political subdivision or road district within its terms.

The validating Acts are so comprehensive in their terms that if the Legislature had the constitutional power to pass them, there can be no doubt that the bonds here involved were validated, and that the Attorney-General ought to approve the record. That the Legislature did have the constitutional power to pass these validating Acts, we regard as well settled by the authorities. Tom Green County v. Moody, 289 S. W., 381; Nolan County v. State, 83 Texas, 182; Charlotte Harbor & Northern Ry. Co. v. Wells, 260 U. S., 8; Kansas City Southern Ry. Co. v. Road Imp. District No. 3, 266 U. S., 370; Anderson v. Santa Anna, 116 U. S., 356; Bolles v. Brimfield, 120 U. S., 762; County of Leavenworth v. Barnes, 94 U. S., 70; Schneck v. Jeffersonville, 152 Ind., 204; St. Joseph Township v. Rogers, 16 Wall. (U. S.), 644; Grenada Co. Supervisors v. Brogden, 112 U. S., 261, 271; Swartz v. Carlisle Borough, Ann. Cases, 1914b, 458; Cooley's Constitutional Limitations (8th Ed.), pp. 770, 778, 786; People v. Stitt, 117 N. E., 784; People v. Fifer, 117 N. E., 790; People v. Woodruff, 117 N. E., 791.

The general and established rule is, what the Legislature could

have authorized in the first instance, it can ratify if at the time of ratification it has the initial authority to authorize. Charlotte Harbor & Northern Ry. Co. v. Wells, 260 U. S., 8; Tom Green County v. Moody, 289 S. W., 381; Nolan County v. State, 83 Texas, 182, and other authorities, supra.

That the Legislature could have defined and constituted the territory set forth in the boundaries of Anderson County Road District No. 8 as a defined road district under the Constitution and laws of this State, and authorized the issuance of the bonds in controversy by a two-thirds vote of the qualified electors, under the provisions of Sec. 52, Art. 3, of the Constitution, and the levy of a general property tax to pay the bonds and all interest thereon, is, we think, well settled by the authorities. Tom Green County v. Moody, 289 S. W., 381; Browning v. Hooper, 269 U. S., 396; Valley Farms Co. v. Westchester, 261 U. S., 155; Hancock v. Muskogee, 250 U. S., 454; Withnell v. Construction Co., 249 U. S., 63, 69; Vernon's Anno. Texas Constitution, Art. 3, Sec. 52. Having the power to create this road district in the first instance, and to authorize the issuance of bonds and levy of taxes in connection therewith, it necessarily follows, under the authorities we have cited, that the Legislature had the right to validate the entire proceeding by the enactment of the laws cited and quoted from.

A complete review of the authorities does not appear to be necessary, but in view of the importance of the question we will direct particular attention to some of them.

In the case of Charlotte Harbor & Northern Ry. Co. v. Wells, supra, a bill in equity was brought to declare illegal a special road and bridge district in Florida, and restrain the county commissioners from paying out any funds in settlement of supposed obligations of the district. The ground of the suit and the relief prayed for were based upon the proposition that the district was constituted of territory which overlapped territory included in another district theretofore created, and that therefore the Board of Commissioners to which the creation of the district was committed by the law of the State, as the law then existed, was without power to establish the district. At some stage of the proceeding, not disclosed by the record, the Legislature of Florida passed an Act having for its special purpose the validation of the action of the commissioners in creating the road district with overlapping territory. The Act was passed for the purpose of legalizing and validating the assessments made for the construction of roads and bridges in the newly

created district, the indebtedness incurred, and the warrants issued in payment of the expense incident thereto, or which might thereafter be issued. The validating Act also legalized the assessment and taxes in the district. In that case the Legislature had the original power to have authorized the creation of a district with overlapping territory, but it had not done so. The validating Act was attacked in the courts as being inhibited by the Fourteenth Amendment to the Constitution of the United States, in that "the said bill attempts to legalize a proceeding of the County Commissioners of DeSoto County, Florida, who were mere administrative officers and which proceeding was void *ab initio* and without jurisdiction, and under which proceeding certain taxes were levied against the property of your petitioner, prior to the passage of said Act of the Legislature, and therefore the said Act of the Legislature, in so far as it purports to create a liability on your orator for taxes previously assessed against your orator under a proceeding of said administrative officers is void *ab initio* and without jurisdiction." The Supreme Court of the United States sustained the validating Act, and denied the relief, saying:

"In support of the contention of the petition, plaintiff in error makes a distinction between a *curative* statute, which it is conceded a Legislature has the power to pass, and a *creative* statute, which, it is the assertion, a Legislature has not the power to pass. The argument in support of the distinction is ingenious and attractive, but we are not disposed to review it in detail.

"The general and established proposition is that, what the Legislature could have authorized, it can ratify if it can authorize at the time of ratification. United States v. Heinszen & Co., 206 U. S., 370; Wagner v. Baltimore, 239 U. S., 207; Stockdale v. Insurance Companies, 20 Wall., 323. And the power is necessary, that government may not be defeated by omissions or inaccuracies in the exercise of functions necessary to its administration." 260 U. S., 11, 12.

In the case of Kansas City Southern Ry. Co. v. Road Imp. District No. 3, 266 U. S., 379, the controversy was over the constitutional validity of an assessment of benefits accruing to railway property from the improvement of a public road in Sevier County, Arkansas. The district was made to embrace territory covering approximately three miles on either side of a public road, and in this territory the railway company's property was located. The estimated cost of the improvement was some $200,000, and a tax was laid on all the real property within the district, including the property of the railway company.

Assessors appointed by the county court assessed the benefits and set forth in their report the names of the owners of each parcel of property, a description of it, its present value for taxing purposes, and the amount of benefits assessed against it. When this assessment was completed it was to be filed in the county court, where a review was had after notice; which court had power to equalize and lower or raise the assessment of benefits to particular parcels, as justice might require. From this an appeal could be taken to the circuit court, and a further appeal to the Supreme Court of the State. There was located within the district some eleven miles of railway track, a depot, and other buildings. In regular course the assessments were reviewed by the county court and confirmed, that court finding that the lands and other real property in the district would be "greatly benefited" by the improvement, and that the assessment of benefits was "fair, just, and equal to all land owners." The railway company appealed to the circuit court, and while the appeal was there pending the Legislature passed a special Act recognizing the creation and boundaries of the district, approving the plans for the improvement of the road, confirming the assessment of benefits as sustained by the county court, and declaring that the assessment "fairly represents the benefits that will accrue" to the railway's property and other tracts in the district. The railway company then took the position that the legislative confirmation was open to the same constitutional objections that were made to the original assessment. The Supreme Court of the United States sustained the confirmatory Act of the Arkansas Legislature, and sustained the assessment of benefits there made, saying:

"The special confirmatory act was recognized by the Supreme Court of the State as a legislative determination of the lands which will be benefited and of the proportions in which they will share in the benefits. It therefore must be treated here as an admissible legislative assessment of benefits, so far as the State Constitution is concerned. * * * We conclude that the objections made to the assessment on constitutional grounds are not well taken."

In the case of Anderson v. Santa Anna, 116 U. S., 356, the facts, in so far as necessary to an understanding of the opinion, were as follows: The action was against the town of Santa Anna to recover on certain negotiable bonds issued by it on the first day of October, 1867, under a legislative Act to amend the articles of association of the Danville, etc. R. R. Co., approved February 28, 1867. This law, for the purpose of aiding in the con-

struction of the railroad, authorized incorporated towns along its route to subscribe to the capital stock of the company in any sum not exceeding $250,000. Sec. 13 of the Act provided that no such subscription should be made until the question had been submitted to the legal voters of the town. The elections were to be ordered upon presentation of a petition signed by a representative number of the legal voters and taxpayers, in which the amount to be subscribed was to be stated, notices were to be posted, and the elections held. The section, however, contained a proviso to the effect that where elections may have theretofore been held and a majority of the legal voters of any town were in favor of a subscription to the railroad, then in that case no other election need be held, and the amount so voted for could be subscribed as in the Act provided. It contained also this clause: "And such elections are hereby declared to be legal and valid as though this Act had been in force at the time thereof and all the provisions hereof had been complied with." The bonds involved in this suit issued under the Act of 1867 were not authorized by any election of the voters of the town subsequent to the passage of the law providing for such subscription and election. The election made the basis of these bonds was held on the 21st of July, 1866, at which the corporate authorities were authorized by a majority vote to subscribe the sum of $50,000, payable in bonds of the town. After the passage of the law in February, 1867, some six months after the vote had been taken, the city authorities executed the bonds sued on. The Supreme Court of the United States held the bonds valid, in part saying:

"The Legislature did not in any just sense impose a debt on Santa Anna township against the will of its corporate authorities, the electors. The Act embraces only townships which, by a majority of their legal voters, at an election previously held, had declared for a subscription. That such majority was given at an election held by the township in the customary form is averred in the declaration and is admitted by the demurrer. The curative Act only gave effect to the declared will of the electors. As the Constitution of the State did not provide any particular mode in which the corporate authorities of a township should manifest their willingness or desire to incur a municipal debt for railroad purposes, *we perceive no reason why the action of the majority of the legal voters, at an election held in advance of legislative action, might not be recognized by the Legislature and constitute the basis of its subsequent assent to*

*the creation of such indebtedness, and its ratification of what had been done."*

Continuing, the court said:

"In Grenada County v. Brogden, 112 U. S., 261, 271, where somewhat the same question was involved, we said: 'Since what was done in this case by the constitutional majority of qualified electors and by the Board of Supervisors of the county would have been legal and binding upon the county had it been done under legislative authority previously conferred, it is not perceived why subsequent legislative ratification is not, in the absence of constitutional restrictions upon such legislation, equivalent to original authority.'* * * It cannot be denied that the Legislature could lawfully have authorized a subscription by Santa Anna township to the stock of this road, upon the assent, in some proper form, of a majority of its legal voters. The Act of 1867 interfered with no vested right of the township; for, as an organization entirely for public purposes, it had no privileges or powers which were not subject, under the Constitution, to legislative control. *The statute did nothing more than to ratify and confirm Acts which the Legislature might lawfully have authorized in the first instance."* 116 U. S., 363, 364.

By an Act of the Legislature of Illinois incorporating the Dixon, Peoria & Hannibal Railroad Company, passed in March, 1867, authority was given certain cities and incorporated towns to subscribe to the stock of the railroad company in amounts not exceeding $35,000. At an election called and held subsequent to the passage of this Act, the town of Brimfield voted to subscribe $35,000, and at the same time and place, *but without legislative authority therefor, the same electors voted to make an additional subscription of $15,000.* In March, 1869, the Legislature passed an Act reciting that the last named sum had been voted by a majority of the legal voters of said township at said election, and provided that said election "is hereby legalized and confirmed, and is declared to be binding upon said township, and may be collected from said township, in the same manner as if said subscription had been made under the provisions of said charter." An action was brought to recover upon the bonds, and resisted by the municipality. It was not disputed that the bonds in suit would have been valid obligations of the town of Brimfield if the election of August 3, 1868, at which they were voted, had been previously authorized by the statute. The Supreme Court of the United States upheld the constitu-

tionality of the curative Act and the validity of the bonds, and in its opinion in part said:

"*The question then, is, could the Legislature, by subsequent ratification, make that legal which was originally without legal sanctions, but which it might, in the first instance, have authorized? A negative answer to this question would be in conflict with numerous decisions of this court upon the general question as to the power of a Legislature to enact curative statutes, when not restrained by constitutional provisions—the last of those decisions being Anderson v. Santa Anna. We adhere to what has been heretofore said by this court upon that subject.*

\* \* \* \* \* \* \*

"*We must presume, upon this record, that the Legislature ascertained, as stated in the Act in question, that such a majority had, at the election of August 3, 1868, voted for the additional subscription of $15,000; and we do not see that the subsequent ratification by the Legislature of what had been done by the voters can be regarded as imposing a debt upon them against their will. The Legislature simply gave effect to the wishes of the people, as expressed in the customary mode for ascertaining the popular will. Grenada County Supervisors v. Brogden, 112 U. S., 261, 262; Anderson v. Santa Anna, 116 U. S., 356, 364.*"
Bolles v. Brimfield, 120 U. S., 762, 765.

The case of County of Leavenworth v. Barnes, 94 U. S., 70, is one where the necessary vote to authorize a valid action was taken before there was any legislative Act authorizing the vote to be taken, or authorizing the creation of the obligation. The suit was on bonds issued under an Act of the State of Kansas, approved February 10, 1865, to authorize counties and cities to issue bonds to railroad companies. The Act authorized counties to make subscriptions to the capital stock of railroad companies, to issue its bonds in payment therefor, upon previous assent of the electors of the county at an election held upon notice. The contention was that without this Act there was no authority in the county to issue the bonds in suit. The fourth section of the Act, however, contained a provision to the effect that in case the commissioners of the county had theretofore submitted to the electors the question of issuing bonds to the railroad company, and at such election the voters had voted to issue the bonds, then the board was authorized to issue them. The Supreme Court sustained the validity of the bonds, against the objection that the bonds were invalid for the reason that the only vote taken by the electors of the county was before the

passage of the Act authorizing them.    As to this, the Supreme Court of the United States in its opinion said:

"In the present case a majority of the electors voting declared themselves in favor of the subscription and issue of the bonds. This is all that is required, either by the first or fourth sections. The same rule is intended to be applied in each case.    This is an explicit authority from the Legislature to the county board to adopt *any previous expression of the electors of their willingness to make such subscription.    It is conclusive on the point under consideration.*"

The facts in the case of Schneck v. City of Jeffersonville, 152 Ind., 204, were briefly as follows:    The City of Jeffersonville had issued bonds for certain public improvements without the necessary corporate authority.    The issue of bonds was held invalid by the Supreme Court of Indiana in the case of Myers v. City of Jeffersonville, 145 Ind., 431.    Subsequent to that decision, on March 2, 1897, the Legislature passed an Act "to legalize certain bonds issued by the City of Jeffersonville, and to permit said bonds to be refunded, and declaring an emergency."    The purpose of this statute was to legalize and validate in all respects the bonds in controversy.    The insistence was that the Legislature did not possess the power, under the circumstances, to legalize the bonds in dispute and authorize their refunding, and that the Act, by legalizing the bonds, created a debt, etc., in violation of the constitutional limitation.    The Supreme Court of Indiana sustained the validity of the curative statute and of the bonds.    The curative Act, describing the identical bonds in issue, declared that the bonds "are hereby ratified, confirmed and declared legal and valid obligations of such city, and the said ordinance of the Common Council and all Acts in respect to the issue of such bonds are hereby ratified, confirmed, and made legal."    The Supreme Court, in sustaining the curative Act, in part said:

"This purpose or object, we are constrained to hold, was accomplished by the Act in controversy, and that the lawmaking power thereby ratified, confirmed, and made legal the unauthorized power or authority which the city, through its council, assumed to exercise.    In its effect and operation the Act must be held equivalent to conferring original legislative authority upon the City of Jeffersonville which would have authorized it to incur the indebtedness and issue the bonds to obtain the necessary means to defray the debt; and these obligations must therefore be considered in the same light as though they were valid *ab initio,* unless the curative statute can be said to be open to

the objections urged against it by appellant.  That the Legislature has the power to enact legislation of the character of that in question, in the absence of constitutional restrictions either Federal or State, where vested rights have not intervened, is ·well affirmed and settled by many decisions, not only in this jurisdiction but elsewhere.  Among the number we cite the following:  Walpole v. Elliott, 18 Ind., 258; Sithin v. Board, etc., 66 Ind., 109; Marks v. Purdue University, 37 Ind., 155; Gardner v. Haney, 86 Ind., 17; Cookerly v. Duncan, 87 Ind., 332; ·Muncie Natl. Bank v. Miller, 91 Ind., 441; Kelley, Treasurer, v. State ex rel., 92 Ind., 236; Johnson v. Board, etc., 107 Ind., 15; Bronson v. Kinzie, 1 Howard, 310, 331; Gelpcke v. City of Dubuque, 1 Wall., 175; Thompson v. Lee County, 3 Wall., 327; City of Lamson, 9 Wall., 477; New Orleans v. Clark, 95 U. S., 644; Mattingly v. District of Columbia, 97 U. S., 687; Pompton v. Cooper Union, 101 U. S., 196; Read v. Plattsmouth, 107 U. S., 568, 2 Sup.· Ct., 208; Quincy v. Cooke, 107 U. S., 549, 2 Sup. Ct., 614; Jonesboro City v. Cairo, etc. R. Co., 110 U. S., 192, 4 Sup. Ct., 67; Anderson v. Santa Anna Tp., 116 U. S., 356, 6 Sup. Ct., 413; Bolles v. Brimfield, 120 U. S., 759, 7 Sup. Ct., 730; City of Bridgeport v. Housatonuc R. Co., 15 Conn., 475; Lycoming v. Union, 15 Pa. St., 166; Sharpless v. Mayor, etc., 21 Pa. St., 147; State ex rel. v. Mayor, etc., 10 Rich. (S. C.), 491; Simonton on Mun. Bonds, Secs. 256 and 257; Cooley on Const. Lim., 466; Beach Pub. Corp., Sec. 904."

Again the court said:

"The ratifying Act of 1897 cannot be said to fasten unwillingly upon the city the indebtedness and thereby compel its payment.  In a sense it simply gives effect to the will of the city, as expressed by it in 1876, through its Common Council, and no doubt also ratifies the desire of a large majority of the resident freeholders, expressed, presumably, to the Common Council, by means of petition or otherwise.

   \*  \*  \*  \*  \*  \*  \*

"The contention of appellant's counsel that the Legislature was not empowered to enact the statute in dispute, for the reason that it creates a debt, and thereby the city, at the time of its passage, became indebted in excess of the constitutional limit fixed by Sec. 1, Art. 13, as amended March 14, 1881, is not tenable.  The Legislature, by the Act in question, neither created or professed to create a debt.  It simply recognized the indebtedness and bonds as having an existence in 1876, and ratified, confirmed, and legalized them."

In the case of People v. Stitt, 117 N. E., 784, a high school
district had been organized under a statute subsequently declared
unconstitutional by the Supreme Court of Illinois. People v.
Weis, 114 N. E., 331. The suit, in form of *quo warranto,* was
brought to oust the president and members of the school board
from their offices, because the law under which the district was
organized was void, as declared by the Supreme Court. While
the suit was pending the Legislature passed a curative Act
validating the creation of the school district. The insistence
was made that the curative Act could not validate the creation
of the school district, because the Act under which it had been
organized had been held unconstitutional. The Supreme Court
of Illinois, after stating the rule which we have previously
stated is the general one as to validating Acts, held the curative
Act valid, saying, in part:

"This doctrine as to curative statutes applies as well to laws
that have been held unconstitutional as to those laws that have
been held invalid for other reasons. Ross v. Board of Super-
visors, 128 Iowa, 427, 104 N. W., 506, 1 L. R. A. (N. S.), 431;
Carlstadt Natl. Bank v. Borough of Hasbrouck Heights, 83 N. J.
Law, 383, 84 Atl., 1069; State v. Abraham, 64 Wash., 621, 117
Pac., 501; Whitlock v. Hawkins, 105 Va., 242, 53 S. E., 401;
Donley v. City of Pittsburgh, 147 Pa., 348, 23 Atl., 394, 30 Am.
St. Rep., 738. See also Tiaco v. Forbes, 228 U. S., 549, 33 Sup.
Ct., 585, 57 L. Ed., 960."

The other Illinois cases cited by us are similar.

The opinions of this court, in so far as questions similar to
those decided by the cases cited and discussed have been pre-
sented, have been in line with the decisions of the Supreme
Court of the United States, and sustain the validity of the
curative statutes here involved. In the case of Tom Green
County v. Moody, supra, one of the validating Acts in issue
here was involved, and its validity and effectiveness sustained.
In the opinion, by ASSOCIATE JUSTICE GREENWOOD, we said:

"We are, however, of the opinion that if the bonds were
originally subject to attack on constitutional grounds, they have
since been validated by Act of the Legislature of Texas. The
Governor convened the Legislature in special session for the
purpose, among others, of passing—'necessary and proper legis-
lation that will validate and legalize State, county, commission-
ers' precinct, and special road district bonds or securities whose
validity has been brought in question by the decision of any
State or Federal court, or otherwise. And to cure any defects
in the issuance of said bonds or securities, or to provide by

proper legislation to make said bonds or securities binding and valid debts and obligations of the authority issuing the same.'

"The Governor, on October 14, 1926, approved a law, which became effective on that date, whereby the election at which the bonds here involved were voted, the notice of the election, all orders of the Commissioners Court, the taxes levied to pay the bonds, and all other proceedings pertaining to the bonds were each and all expressly ratified and validated.

"We have already shown that under principles repeatedly declared by the Supreme Court of the United States the Legislature of Texas might in the first instance have made any reasonable selection of the property to be taxed for the improvement of the public roads in Tom Green County, and could have levied ad valorem taxes on such property to pay the cost of such improvement. There being no constitutional provision to the contrary, whatever the Legislature might originally have lawfully authorized in respect to these matters it could subsequently confirm. The rule is thus tersely put by Mr. Justice Gaines in Nolan County v. State, 83 Texas, 182, 17 S. W., 823, viz.:

" 'Where a contract which a municipal corporation has attempted to create is invalid merely for want of legislative authority to create it, it can be made valid by a subsequent law'."

Under the authorities we are convinced that the curative Acts passed by the Legislature, and heretofore quoted in this opinion, were valid and constitutional exertions of the legislative power, and were and are effective to make valid the bonds and all proceedings under which they were issued involved in this case. It follows from the foregoing that it is the duty of the Attorney-General to approve the bond record as prayed for, and that the writ of mandamus ought to issue. Mandamus awarded.

Associate Justice Greenwood not sitting.