**YOAKUM COUNTY WATER CONTROL AND IMPROVEMENT DISTRICT NO. 2, et al., Appellants,**

v.

**FIRST STATE BANK, Appellee.**

No. 358.

Court of Civil Appeals of Texas.

Tyler.

Oct. 3, 1968.

Rehearing Denied Oct. 31, 1968.

Crenshaw, Dupree & Milam, O. V. Scott, Jr., Lubbock, for appellant, R. E. McFall Estate.

Key, Carr, Carr & Clark, Donald M. Hunt, Lubbock, for appellants, Guetersloh.

J. W. Lyon, Jr., Silverton, Vernon A. Townes, Denver City, Wilson, Kendall, Koch & Randle, Gaynor Kendall, Austin, for appellee.

MOORE, Justice.

This is an appeal from a summary judgment. First State Bank, of Silverton, Texas, plaintiff below and appellee herein, brought suit against defendants, Yoakum County Water Control And Improvement District No. 2 (hereinafter called the "district") and its directors, seeking a judgment against the district upon ten $1,000.00 bonds issued by the district and subsequently purchased by the bank.

The bank alleged that at the time of the respective maturities of the bonds, the bank duly presented said obligations to the district and demanded payment thereof, but that the district failed and refused, and continues to fail and refuse, to pay the bonds and coupons or any part thereof. The prayer was for judgment (1) adjudicating the bonds to be valid and enforceable obligations of the district, for the payment of which the district is legally obligated to impose ad valorem taxes on all taxable property in the district in accordance with the covenants contained in the bonds; (2) for judgment upon the bonds in the sum of $10,000.00, together with all accrued interest thereon; and (3) for an order compelling performance of the covenants contained in the bonds by a writ of mandamus directed to defendants, Mike W. Butler and all other members of the Board of Directors of the district, commanding them to levy and collect sufficient taxes to produce the sum necessary to discharge the obligations evidenced by the bonds. The bank's petition also named as party defendants all owners of the mineral estate under the lands comprising the district (hereinafter referred to as the "McFall group"), and certain owners of the surface estate of the lands comprising the district (hereinafter referred to as the "Guetersloh group"). The petition recites that the landowners were joined as party defendants because of cer-

tain alleged attempts by them to interfere with the assessment and collection of taxes upon the lands owned by them lying within the district.

The district answered with a general denial. The directors answered with a general denial and specifically denied that they had failed to levy and collect taxes.

The McFall and Guetersloh groups of defendants filed answers consisting of general denials and special pleas attacking the validity of the district, as well as the bonds, alleging: (1) that the district was invalid and not legally created according to law because the petition for its creation was not signed by a majority in number, or a majority in value of the owners of taxable property in the proposed district; (2) that (a) the order of the Commissioners' Court creating the district was invalid, and (b) the adoption by the district of a plan of ad valorem taxation was invalid as a denial of due process because the notice by publication as provided by the statute was not sufficient to constitute notice of the petition to establish the district or the adoption of the plan of ad valorem taxation as required by the Constitution of this state and the United States; and (3) that the bonds were invalid because no election was held at which the proposition of their issuance had been submitted to and approved by the taxpaying voters of the district as required by Sec. 59, Art. XVI of the Constitution of Texas, Vernon's Ann.St.

After depositions had been taken, the parties entered into an "Agreement and Stipulation as to Certain Facts" attaching thereto a "Transcript of Legal Proceedings" containing all of the legal instruments used in the formation of the district, together with an instrument showing final authorization by the Attorney General for the issuance of the bonds in question.

Appellee, First State Bank, filed a motion for summary judgment alleging that upon the basis of the "agreements," the depositions, and affidavits attached to the motion, no material issue of fact remained to be determined and therefore the bank was entitled to a summary judgment for the following reasons:

(1) The "Transcript of Legal Proceedings" shows upon its face, as a matter of law, that the district was regularly created in accordance with the statutory law of this state.

(2) That subsequent to its creation and organization, the district was validated by an Act of the Legislature of the State of Texas.

(3) That the undisputed facts show that the bank is a bona fide purchaser of the bonds, and under the doctrine of estoppel by recital, appellants are estopped to assert that the recitals in the instruments creating the district, as well as in the bonds, are incorrect or untrue.

Prior to the hearing on the motion, the bank moved for a severance, seeking to sever all causes of action and cross-actions except the bank's cause of action against the district. After a hearing, the trial court granted the motion for severance and granted the summary judgment in favor of the bank against the district for the sum of $10,000.00 on the principal of the bonds, together with accrued interest thereon, and ordered the issuance of a writ of mandamus and such other writs as necessary to enforce the judgment.

The Guetersloh and the McFall groups of defendants duly perfected an appeal from the judgment. Yoakum County Water Control And Improvement District No. 2 did not appeal nor did any of its directors perfect an appeal. Consequently, the only appellants on this appeal are the Guetersloh and McFall groups of appellants.

Section 59 of Art. XVI of the Constitution of Texas expressly authorized the Legislature to create or provide for the creation of conservation and reclamation districts which shall be governmental agencies and bodies politic and corporate with such powers of government and with authority

to exercise such rights, privileges and functions as may be conferred by law. The applicable articles of the revised statutes relating to the formation of water control and improvement districts are to be found in Art. 7880-1 et seq., Vernon's Ann.Tex.Civ. Stat.

Without setting out the statutes at length, they provide for initiation of proceedings for the establishment of such a proposed district by a petition signed by a majority in number of the holders of title to the lands therein, and the owners of a majority in value of the lands therein as shown by the county tax rolls. (Art. 7880-10). The petition is required to be filed in the office of the County Clerk, and therefrom the County Judge is required to enter an order setting the date of a hearing thereof by the County Commissioners' Court. The statute provides that the County Clerk shall thereupon issue a notice of such hearing by causing the notice to be published in a local newspaper for three successive weeks. (Art. 7880-14).

At the hearing before the Commissioners' Court, " * * * any person whose land is included in or would be affected by the creation of such district may appear and contest the creation thereof * * *."

If the Commissioners' Court, upon a hearing, makes the required findings as to necessity for the district, etc., it enters an order establishing the district, and interim directors are appointed (Art. 7880-20) who must call an election and submit to the vote of the qualified resident property taxpaying voters the proposition of confirming or disaffirming the creation of the district. (Arts. 7880-23 and 7880-24).

If the Commissioners' Court enters an order establishing the district, " * * * any person who did actually appear and protest said petition and offer testimony against the creation of the district, may appeal from the order of the court by giving notice of appeal in open court * * * and by filing with the clerk of

the court within five days a good and sufficient appeal bond in the sum of $2,500.00, * * *." The appeal is to the district court and when such appeal is taken, the court hears the matter de novo. (Art. 7880-18).

The act expressly provides that the Commissioners' Court shall hold a hearing and " * * * shall afford all interested persons adequate and exclusive opportunity to protest the creation of a district, and thereafter, save as hereinafter provided, no suit shall be permitted in any court of this State contesting the validity of the formation and boundaries of a district created hereunder, * * * provided, however, that all such matters may be judicially inquired into and determined in any suit brought by the State of Texas, through the Attorney General, upon his own motion, or upon the motion of any person affected by the existence or plans of the district, * * *." (Art. 7880-25a).

The facts show that prior to the organization of the district, the land embraced in the district was known as the Duckworth Ranch and contained seven sections of unimproved land. The surface estate was owned by the Duckworths, and the mineral estate was owned by eight separate owners comprising the McFall group. The petition for the establishment of the district was filed on December 8, 1955, and was signed by Lela B. Woolsey, W. L. Norman, J. P. Gibson, David T. Roche, Mike W. Butler, C. Willard Houser and Marvin C. Turner. At the time of the filing of the petition, these seven parties did not reside within the district, nor did they own the fee simple title to the land. They did have a contract, however, to purchase the land from the Duckworths, and on December 12, 1955, they acquired title to the surface estate for a consideration of $90,986.00.

The petition for the establishment of the district purports, upon its face, to be signed by a majority of the holders of title to lands in the district, and by owners

of a majority in value of such lands as reflected by the county tax rolls. The transcript of the legal proceedings recites that the County Judge examined the petition and found it to be in due form and signed by the requisite number of petitioners, and ordered and set same for hearing. The notice of the filing of the petition and of the date of hearing before the Commissioners' Court was given in the form and content specified by the statute.

Subsequent to the order of the Commissioners' Court establishing the district, David T. Roche, Mike W. Butler, C. Willard Houser, Mrs. Eileen Roche and Mrs. Mary Butler were appointed directors of the district. Thereafter, the directors elected the following officers, to-wit: David T. Roche, President; Mike W. Butler, Vice-President; and C. Willard Houser, Secretary. The records of the district further show that a confirmation election and a bond election to authorize improvement bonds in the amount of $787,500.00 were subsequently held and that both propositions resulted in three affirmative votes "for" and none "against." Appellants concede that the written records of the district showing proceedings relating to the formation of the district, as well as records showing that a bond election was held and approved by the Attorney General, are, on their face, letter perfect.

According to the testimony of some of the witnesses, water wells were drilled and pumps were installed on the land. It appears, however, that very little use, if any, was ever made of the equipment. In 1960, all other owners of the surface estate conveyed their interest in the land to Butler, who immediately conveyed to Bock, who subsequently conveyed to Stone. The evidence shows that at or about the time Stone acquired the land, all of the irrigation equipment, as well as the pipe from the water wells, disappeared. In January, 1962, Stone conveyed the surface estate of the seven sections of land to the Guetersloh group, who allege that they purchased the same in good faith without knowledge of the outstanding bonds. According to the records, the district Board of Equalization placed a taxable value on the land within the district at $832,000.00. The records, however, fail to show that any taxes were ever levied or paid. While the evidence does show that the district paid interest on the bonds until July of 1962, the evidence shows the interest payments were made from funds which the above named organizers deposited in the district's bank account.

Appellants have collectively attacked the judgment by four points of error. Under the fourth point, which we will consider first, appellants seek to void the bonds by attacking the order of the Commissioners' Court creating the district. They take the position that they have been denied due process because the organizers failed to comply with the statutes in creating the district. Therefore, they say the district must fall and as a necessary sequence thereof, the bonds must fall. They assert that the petition did not satisfy the statutory requirements in the following particulars: (1) the persons who signed the petition did not, at the date of signing the same, hold a record legal title thereto; and (2) the seven signers of the petition did not constitute a majority in number of the owners of taxable property, because it is without dispute that there were eight other separate owners of severed mineral estate. Appellee replies by saying that since neither the appellants nor any other taxpayers perfected an appeal from the order creating the district within the time and in the manner provided by law, the appellants are without standing in this suit to attack collaterally the validity of the district or to question the proceedings by which it was organized in 1955. We are in accord with the proposition stated by the bank in this respect.

It will be observed that the basis of the attack upon the petition is the alleged failure of the same to comply with one of the requirements of the statutory procedure, to-wit: the alleged failure of the petition to

meet the requirements of the statute as to (1) qualifications and (2) number of persons signing the same. More accurately perhaps, it should be described as an attack upon the findings of the County Judge and the Commissioners' Court, and their order creating the district finding that the petition was signed by the requisite number of qualified signers.

The record shows that more than ten years have elapsed since the date of the order of the Commissioners' Court creating the district. It is without dispute that neither the appellants nor any of their predecessors in title ever attempted to contest the validity of the order by perfecting an appeal to the district court as provided by Sections 17, 18 and 19 of Article 7880. The statute specifically provides that the order shall not be subject to collateral attack. In view of the fact that neither the appellants nor any of their predecessors in title elected to pursue the remedy afforded them by law for contesting the sufficiency of the petition, we think appellants are without standing in this suit to assert that the statute was not followed in the establishment of the district. In Walling v. North Central Texas Municipal Water Authority, 162 Tex. 527, 348 S.W.2d 532, the Supreme Court of this state laid down this rule:

> " * * * When a body has acted and has been dealt with as a corporation after attempting to comply with the requirements of a valid statute authorizing its creation as such, only the State may question its corporate existence on the ground that the law was not followed. La Salle County Water Improvement Dist. No. 1 v. Guinn, Tex.Civ.App., 40 S.W.2d 892, wr. ref.; Kuhn v. City of Yoakum, Tex.Com.App., 6 S.W.2d 91; Bowen v. Board of School Trustees, Tex. Civ.App., 16 S.W.2d 424 (no wr.). * * * "

The statute provides for the method of attack upon the order and thus affords due process. The question of whether or not the order creating the district was based on the required statutory facts is a matter which can be reviewed only by the methods pointed out by the statute. 94 C.J.S. Waters § 319(6), page 288. Thus, we believe the trial court properly concluded that appellants' attack upon the validity of the order fails to raise any issue of a material fact.

Appellants further contend, however, that they were denied "due process" in that they were not afforded personal notice of the hearing before the Commissioners' Court for the creation of the district and also of the hearing held by the district for the purpose of adopting a plan of ad valorem taxation. They contend that the provisions of the statute providing for notice by posting in publication is not sufficient to satisfy the constitutional requirement that the imposition of taxes by the district amounts to a depravation of their property without due process of law. We have concluded that the contention is without merit.

Notice of the proceedings for creation of the district and the adoption of a plan of taxation was given by posting and by publication in the manner prescribed by the applicable statutes.

As we understand the law, personal service on every person within a proposed water control and improvement district of notice of the petition to organize the district is not essential to due process. Publication of the notice in conformity with the statutory method of constructive notice is generally held to be sufficient. 94 C.J.S. Waters § 319(2) (c), page 274; San Saba County Water Control And Improvement Dist. No. 1 v. Sutton, 12 S.W.2d 134, 70 A.L.R. 1255 (Tex.Com.App.,1929); Western Union Telegraph Co. v. Wichita County Water Improvement Dist. No. 1, 30 S.W.2d 301 (Tex.Com.App.,1930); Patterick v. Carbon Water Conservancy Dist., 106 Utah 55, 145 P.2d 503; Browning v. Hooper, 269 U.S. 396, 46 S.Ct. 141, 70 L.Ed. 330 (1925).

Nor do we believe that personal service of notice of the hearing of the adoption of a plan for taxation is essential to due process. In this connection, appellants say that their properties received no direct benefits from the district and therefore to subject their property to taxation without actual notice would result in a depravation of their property with due process of law. The record shows that the district adopted a plan of ad valorem taxation as distinguished from a special assessment based upon benefits. It has been held that when a taxing agency adopts a plan of ad valorem taxation, it is not necessary that the property receive a direct benefit. Western Union Telegraph Co. v. Wichita County Water Improvement Dist. No. 1, supra. Consequently, we believe the publication of the notice of this hearing, in conformity with the statute, was sufficient to satisfy the requirement of due process in this regard.

We are further of the opinion that if, for some reason, the district was unconstitutional and void at the time it was incorporated and organized, the district, together with its bonds, was fully and completely validated by an Act passed by the Regular Session of the 55th Legislature of Texas, Chapter 310, Sec. 2. Without detailing the provisions of the Act, it simply provides: (1) that all organizational proceedings of the district are hereby validated; (2) that all orders, resolutions and findings of the Board of Directors in calling elections and adopting a plan of taxation and issuing bonds are validated; and (3) that all bonds of the district which had theretofore been approved by the Attorney General of Texas are validated and declared to be binding obligations of the district.

Under the provisions of Sec. 59 of Art. XVI of the Constitution, as it existed in 1957, the Legislature had authority to create water control and improvement districts by direct action, and had authority to spread the burden of the improvements authorized by ad valorem taxation on all property including personal and severed mineral interests.

It therefore appears that even though the district in the instant case was subject to all the original infirmities urged by appellants, including not only the statutory deficiencies as to the petition but also that the district was unconstitutional in that the notice of the hearing of its creation and notice of the hearing for the adoption of its taxing structure was insufficient, the validating action was within the power of the Legislature and as a result the district was thereby made valid from its inception. Anderson County Road Dist. No. 8 v. Pollard, Attorney General, 116 Tex. 547, 296 S.W. 1062 (1927); Western Union Telegraph Co. v. Wichita County Water Improvement Dist. No. 1, supra.

The Legislature, however, by enacting the validating statute did not have the power to dispense with the constitutional and statutory requirement that the bonds be authorized by majority vote of the taxpaying voters at an election. Miller v. State ex rel. Abney, 155 S.W.2d 1012 (Tex.Civ.App.) 1941, err. ref.

This brings us to a consideration of appellants' first point of error wherein it is asserted that the summary judgment is erroneous because there is at least some evidence showing that no bond election was ever held, thus creating a material fact issue upon the question of whether or not the required bond election was in fact held. The bank undertakes to uphold the judgment on the ground that it was a bona fide purchaser of the bonds in good faith and therefore appellants are estopped as against it to attack the recitals in the bonds or other records of the district, reciting that the bond election was properly held.

Thus, the question to be resolved is whether the appellants, as taxpayers, are estopped from asserting that the recitals in the bonds and other records of the district are untrue and that the bonds are void.

Each of the bonds in question contained this recital:

"This bond is one of a series of 250 bonds, * * * aggregating Two Hundred Fifty Thousand ($250,000.00) Dollars, issued * * * in accordance with the Constitution and Laws of the State of Texas, * * * and by the authority of a vote of the qualified electors of said District voting at an election held on the 14th day of April, 1956, * * *.

*   *   *   *   *   *

"AND IT IS HEREBY CERTIFIED AND RECITED that the issuance of this bond and the series of which it is a part, is duly authorized by law and by a majority of the duly qualified resident electors owning taxable property in said District and who have duly rendered the same for taxation, voting at an election held for that purpose within said District; and that all acts, conditions and things required to exist and to be done precedent to and in the issuance of this bond, and the series of which it is a part, have been properly done, have happened and been performed in regular and due time, form and manner, as required by law; * * *."

As stated, appellants concede that insofar as the official records of the district are concerned, all proceedings in connection with the issuance of the bond are regular upon the face of the record and show that the bond election was properly called, held, and resulted in three votes being cast for the issue of bonds and levy of taxes in payment therefor and no votes for the contrary proposition. The official records of the district reflect that the following named persons were appointed to act as election officials in both the confirmation election creating the district and in the bond election, to-wit: C. O. Rymer, Presiding Judge; Mrs. C. O. Rymer, Assistant Judge; H. F. Durbin and Mrs. H. F. Durbin, Clerks.

The records further show that each of the above named parties executed certificates, certifying that the confirmation election was duly held on February 18, 1956 and that the bond election was duly held on April 14, 1956 and that both propositions resulted in three votes in favor of the proposition and none against.

It appears without dispute that at the time of the creation of the district and the bond election, Ronald E. Hewitt, who lived alone in a small house constructed of railroad cross-ties, was the only person residing in the district.

For proof showing that no bond election, as distinguished from the confirmation election, was ever held, appellants offered the deposition testimony of Mr. and Mrs. Rymer and Mr. and Mrs. Durbin. When viewed in a light most favorable to appellants, the evidence shows that on February 17, 1956, the Rymers and the Durbins were living in the Rymer home several miles away from the district. On said date, Mrs. Woolsey, one of the organizers of the district, contacted them and requested that they spend the night with Mr. Hewitt at his place in the district so that they could act as election officials and also vote in the election for the creation of the district which was to be held the following day. They consented. Mr. and Mrs. Rymer and Mr. Durbin spent the night at Hewitt's place and Mrs. Durbin arrived the following day. According to the testimony of Mr. and Mrs. Rymer and Mr. Durbin, an election was held on February 18, 1956 for the purpose of voting on the establishment of a water district and Mr. and Mrs. Rymer and Mr. Durbin voted in the election. Both Mr. and Mrs. Rymer and Mr. and Mrs. Durbin testified that they acted as election officials and that they each signed two sets of election returns which they did not read. According to their testimony, the election held on February 18th was the only election in which they participated or had any knowledge of. However, neither of them dispute the fact that the official election returns showing that they acted as

election judges in a bond election on April 14, 1956, contained their signatures certifying that such a bond election was held on such date and that the proposition carried by a vote of three to nothing. While there is other evidence in the record showing that an election was held on said date, we think the foregoing evidence is sufficient to raise an issue of fact upon the question of whether or not a bond election was held on said date. Appellee contends, however, that the appellants are estopped to challenge the validity of the bonds under the doctrine of estoppel by recital.

It is generally held that a political subdivision is estopped from disputing as against a bona fide purchaser of its bond the truth of facts stated in its public records. Citizens' Bank v. City of Terrell, 78 Tex. 450, 14 S.W. 1003 (1890); Town of Coloma v. Eaves, 92 U.S. 484, 487, 23 L.Ed. 579; 43 Am.Jur., Sec. 194, page 426; 64 C.J.S. Municipal Corporations § 1966, page 620; 15 McQuillan on Municipal Corporations, 3rd Ed., page 617 (Municipal Bonds, Sec. 43.77); 1 Jones on Bonds and Bond Securities, 4th Ed., page 282, Sec. 272.

The legal basis for the rule is stated in Citizens' Bank v. City of Terrell, supra:

"* * * When the law makes the existence of the power to issue bonds depend upon the existence of a given state of facts, which depend for proof of their existence upon parol evidence, and appoints a tribunal to ascertain the facts and to create the debt and issue negotiable bonds, if it finds that the required facts exist, and the bonds are issued and contain recitals that the facts existed that conferred authority to issue them, and such negotiable bonds go into the hands of *bona fide* holders, they are collectible, notwithstanding the non-existence of the facts required to confer the authority to issue them. In such cases, the validity of the bonds does not exist in disregard or violation of the law, but because the ascertainment of the facts that confer the power has been delegated to the body that issues them, and its ascertainment of the facts is held to be conclusive in favor of the innocent holders of the negotiable securities, against which no evidence will be heard. * *"

In the case of Town of Coloma v. Eaves, supra, the court explained the reason for the rule, as follows:

"* * * These bonds were intended for sale; and it was rationally to be expected that they would be put upon distant markets. It must have been considered, that, the higher the price obtained for them, the more advantageous would it be for the company, and for the cities and towns which gave the bonds in exchange for capital stock. Every thing that tended to depress the market-value was adverse to the object the legislature had in view. It could not have been overlooked that their market-value would be disastrously affected if the distant purchasers were under obligation to inquire before their purchase, or whenever they demanded payment of principal or interest, whether certain contingencies of fact had happened before the bonds were issued,—contingencies the happening of which it would be almost impossible for them in many cases to ascertain with certainty. Imposing such an obligation upon the purchasers would tend to defeat the primary purpose the legislature had in view; namely, aid in the construction of the road. Such an interpretation ought not to be given to the statute, if it can reasonably be avoided; and we think it may be avoided.

"At some time or other, it is to be ascertained whether the directions of the act have been followed; whether there was any popular vote; or whether a majority of the legal voters present at the election did, in fact, vote in favor of the subscription. The duty of ascertaining was plainly intended to be vested somewhere, and once for all; and the only persons spoken of who have any

duties to perform respecting the election, and action consequent upon it, are the town-clerk and the supervisor or other executive officer of the city or town. It is a fair presumption, therefore, that the legislature intended that those officers, or one of them at least, should determine whether the requirements of the act prior to a subscription of the stock of a railroad company had been met. * * * "

In our opinion, any other rule would encourage the perpetration of fraud upon the bond-buying public and seriously restrict the credit of all public agencies, as was observed by the United States Supreme Court in the early case of Bissell v. City of Jeffersonville, 24 How. 287, 16 L.Ed. 664 (1860), wherein the court said:

> "Capitalists could not be expected to accept such paper, and advance money for it, unless the authority to issue it was put beyond dispute. They certainly would not pay value for such securities, with knowledge that the question under consideration would be open to litigation whenever payment, either of principal or interest, was demanded."

▇▇▇ Appellants argue, however, that the rule applies only against the district and not against the appellants, as taxpayers. We disagree. Under the doctrine of estoppel by recital, we think the taxpayers are estopped to challenge the findings and the recitals through which the bonds were issued, as effectively as the district itself. City of Tyler v. Tyler Building & Loan Ass'n, 99 Tex. 6, 86 S.W. 750 (1905).

The only remaining question is whether there is sufficient evidence to create a material issue of fact upon whether or not the bank was a bona fide purchaser for value without notice of any of the alleged irregularities asserted by appellants.

The record shows that H. L. Shaffer, a licensed dealer in municipal bonds, purchased the bonds in question from the district in 1959 for 92 cents on the dollar of face value, plus accrued interest for a total sum of $9,383.83. Shortly thereafter, Shaffer offered to sell the bonds to James F. Smith, President of the Amarillo Savings and Loan Association. Smith subsequently purchased the bonds for the Association for a total dollar price of $10,402.28, including premium and interest. In 1961, the Savings and Loan Association decided to sell the bonds, and James F. Smith, who was also President of the First State Bank of Silverton, purchased the bonds on behalf of the bank for a total consideration of $10,422.05, including premium and interest. It is without dispute that the bank purchased the bonds for valuable consideration before maturity. Therefore, the specific question involved here is whether or not the bank purchased the bonds in good faith. In determining this question, we deem it expedient to quote from our Negotiable Instruments Statutes, Section 56, Article 5935, V.A.T.S., which reads as follows:

> "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

Appellants say that there is sufficient evidence in the record to raise a fact issue of bad faith on the part of James F. Smith because Smith admitted that prior to purchase, he had read a brochure advertising the bonds for sale which stated that the district contained 4543 acres of land with an assessed taxable valuation of $832,000.00. Appellants argue that as a result of the knowledge of these facts and by the exercise of reasonable diligence, Smith could have determined that the assessed valuation grossly exceeded the fair cash market value of the land and Smith should have known that the assessed value was grossly overstated and that the district would be unable to collect sufficient taxes to discharge the $250,000.00 bond issue. In ad-

dition to this, appellants further assert that Smith was charged with notice of the contents of all the public records of the district as well as all public records of Yoakum County. Therefore, they say that the purchase could not have been in good faith because by the use of reasonable diligence Smith could have ascertained that (1) the persons who signed the petition for organization did not own the land or reside in the county; (2) there were no qualified voters in the district; (3) the seven persons who purchased the land paid only $90,000.00 for the surface estate; (4) the persons who voted in the bond election were not qualified voters and that the election was fictitious; (5) the land had never been farmed and only a portion thereof was tillable; (6) there were no tax rolls; (7) no taxes had ever been paid; and (8) the value of the land would not support the taxable valuation placed thereon by the district. Consequently, they say that since Smith was charged with this knowledge of the facts, he knew or should have known that the district was purely a promotional scheme and a fraud and that the bonds were invalid.

■ It is the well settled law of this state that the ordinary rule of notice does not apply to the purchaser of a negotiable instrument for valuable consideration before maturity. The test in negotiable instrument cases is good faith, and not diligence or negligence. Unless the purchaser has actual knowledge of facts and circumstances that would render the paper noncollectible, or has knowledge of such facts as that a purchase of the instrument would amount to bad faith, it is immaterial that he has notice of such facts as would put a reasonably prudent person on inquiry, and that such inquiry would lead to discovery. West v. First Baptist Church, 123 Tex. 388, 71 S.W.2d 1090 (1934); Quanah, A. & P. Ry. Co. v. Wichita State Bank & Trust Co., 127 Tex. 407, 93 S.W.2d 701, 106 A.L.R. 821; 9 Tex.Jur.2d, Sec. 98, page 111.

■ While a purchaser of bonds is bound to know the law which conferred power to issue the same, and to take notice of the contents of any record or order which is by law required to be made for issuance of the bonds, the purchaser is not required to examine or ascertain the contents of any order or record which does not constitute the source of power of authority for issuing the bonds. Mitchell County v. City Nat. Bank, 91 Tex. 361, 43 S.W. 880, 889, (1898).

■ An inspection of the instruments constituting the source of power and authority for issuing the bonds reveals them to be entirely free of any ambiguities, conflicts or inconsistencies. Indeed, the Attorney General of Texas found that the records were regular in form and content evidencing both valid creation of the district and valid issuance of the bonds. In light of the rule announced in Mitchell County v. City Nat. Bank, supra, the appellee was not required to examine all public records, nor was it charged with notice of all conflicts, doubts and inconsistencies which an inspection of such records would reveal. While it may be true that the district records, upon being compared with the county records, would have revealed that those signing the petition did not own the land; were not residents of the district; did not constitute a majority of the landowners in the district; and were not qualified voters in the district, we fail to find any evidence showing that James F. Smith or anyone else connected with the bank had actual knowledge of such facts. Smith testified that the bonds were purchased in good faith in the ordinary course of business for a valuable consideration and that he had no knowledge of the alleged irregularities. There is no evidence to the contrary. Consequently, we have concluded that the evidence falls short of raising an issue of fact upon the question of bad faith.

■ Throughout their brief appellants have asserted that the evidence shows conclusively that the organizers and officials

of the district were nothing more than promoters bent upon fraud. They take the position that a decision upholding the validity of the bonds would result in the imposition of an unjust tax upon appellant. They argue that under these circumstances, the misconduct of the officials should be visited upon the bondholders rather than the taxpayers. While there is some evidence, when viewed from a hindsight, which would tend to support appellants' allegation of fraud, we think it would be grossly unjust to permit the district or its taxpayers to escape liability upon the ground of falsity of the records which were made by the official agents of the district. Any ruling to the contrary would, in our opinion, tend to destroy public confidence in all municipal bonds and would have a disastrous effect upon the bond market. If the officials of the district were guilty of misconduct, appellants' remedy is in a suit against them for their alleged misdeeds. We do not believe appellants should be permitted to set up the misconduct of the officials of the district as grounds for avoiding the obligations of the district in the hands of a bona fide purchaser.

The judgment of the trial court is affirmed.