YOAKUM COUNTY WATER CONTROL AND IMPROVEMENT DISTRICT NO. 2 et al., Petitioners,

v.

FIRST STATE BANK, Respondent.

No. B–1235.

Supreme Court of Texas.

Nov. 12, 1969.

Dissenting Opinion and Rehearing Denied Jan. 28, 1970.

Crenshaw, Dupree & Milam, O. V. Scott, Jr., and James H. Milam, Key, Carr, Carr & Clark, Donald M. Hunt, Lubbock, for petitioners.

J. W. Lyon, Jr., Silverton, Vernon A. Townes, Denver City, Wilson, Kendall, Koch & Randle, Gaynor Kendall, Austin, for respondent.

HAMILTON, Justice.

This suit was brought by the First State Bank of Silverton, Respondent, to collect ten $1,000 bonds issued by the Yoakum County Water Control and Improvement District No. 2, defendant in the trial court. Two groups of petitioners, the Gueterslohs and McFalls, were made parties defendant because of their alleged attempts to interfere with the assessment and collection of taxes needed to liquidate the bonds upon maturity. Petitioners sought by collateral attack to show that the bonds were void, alleging that the bond issuance was not authorized by an election as required by Art. 16, Sec. 59(c) of the Texas Constitution, Vernon's Ann.St. The trial court ordered a summary judgment for the respondent Bank. The Gueterslohs and McFalls appealed, resulting in the Court of Civil Appeals affirmance of the summary judgment. 433 S.W.2d 200.

The primary issue here is whether or not a bond issuance can be collaterally attacked. If a collateral attack is proper, then the trial court and Court of Civil Appeals erred. However, we hold that a bond issuance cannot be collaterally attacked; rather a bond issuance can be attacked only through a procedure prescribed by statute. As will be seen in the discussion below, this procedure was not followed by petitioners here.

On December 8, 1955, seven persons who had contracted for the purchase of the land for which the Water District was formed filed the petition for organization of the district. The seven purchasers received title to the surface interest in the land on December 12, 1955. The Guetersloh petitioners purchased the surface interest in January, 1962, allegedly without notice that the Water District had issued any bonds. The McFall petitioners had owned the mineral interests since 1927. The McFall petitioners claim no knowledge of the existence of the District nor issuance of any bonds until July, 1963, more than six years after the District was organized and the bonds issued.

After the District was organized, three of the seven purchasers of the land and two of their wives, became the directors of the District. There are apparently some conflicts of facts and lack of information concerning the elections, qualifications of the election judges, eligibility of the voters, and records and minutes of the directors' meetings. The petitioners allege that there was no election to approve the issuance of bonds and assessment of taxes, although the records of the District state that such an election was held on April 14, 1956, and the results of such election.

No taxes were ever collected and when respondent's bonds matured but remained unpaid, respondent filed this suit. Respon-

dent purchased its ten $1,000 bonds in January, 1961, allegedly in good faith. Some of the money received by the District from the sale of bonds was used for drilling wells and for the purchase of irrigation equipment, which has since disappeared. The remainder of the bond proceeds has also disappeared.

The petitioners first allege that their land should not be taxed for the purpose of liquidating the Water District's bonds because the District has no valid existence due to infirmities in its organization. These alleged infirmities include the fact that a majority in number of the landowners did not sign the petition of organization; the persons who did sign the petition did not, at the time of signing, own land within the District; the election judges were not qualified; and the voters were not eligible. However, the transcript on its face reveals that all these legal organizational procedures were followed.

The establishment of a Water District in Texas is governed by Art. 7880, Vernon's Tex.Civ.Stat., which in summary provides for the following procedural steps:

(1) The petition for the organization of a District shall be signed by a majority in number of the landowners and the owners of a majority in value of the land. (Art. 7880–10).

(2) The petition shall be filed in the office of the county clerk in the county in which the land is situated. (Art. 7880–12).

(3) The county judge shall order the date of hearing of the petition by the county commissioner's court. The county clerk shall issue a notice of such hearing. (Art. 7880–14).

(4) At such hearing, any person whose land is included in or affected by the creation of the District may appear and contest such creation. (Art. 7880–17).

(5) Any person who signed the petition of organization or any person who ap-

peared before the commissioner's court and contested such organization may appeal to the district court. (Art. 7880–18).

(6) If the commissioners' court approves the petition, it shall appoint five directors. (Art. 7880–20).

(7) Such directors shall order an election for the purpose of confirming the organization of the District. (Art. 7880–23).

(8) If a majority of the voters favor the organization of the District, then such organization is finally confirmed and ratified. (Art. 7880–24).

The petitioners' contentions relating to the validity of the district itself, regardless of their merit, cannot be raised in this suit. Art. 7880–25a states:

"It is the intent hereof that Sections 18 and 19 of this Act * * * shall afford all interested persons adequate and exclusive opportunity to protest the creation of a district, and thereafter, save as hereinafter provided, no suit shall be permitted to be instituted in any court of this State contesting the validity of the formation and boundaries of a district created hereunder, or contesting any bonds or other obligations created hereunder * * *; It is expressly provided, however, that all such matters may be judicially inquired into and determined in any suit brought by the State of Texas, through the Attorney General, upon his own motion, or upon the motion of any person affected by the existence or plans of the district, upon good cause shown * * *."

■■ Hence, there are only two ways in which to raise the question of the validity of the District itself:

(1) Appeal to the district court from the commissioner's court.

(2) Suit by the State of Texas through the Attorney General.

The petitioners did not use either of these two methods. Because the statute provides for these two methods exclusively, the petitioners are therefor precluded from using any other method of contesting the District's validity. In Walling v. North Central Texas Municipal Water Authority, 162 Tex. 527, 348 S.W.2d 532 (1961), this Court stated:

> "When a body has acted and has been dealt with as a corporation after attempting to comply with the requirements of a valid statute authorizing its creation as such, only the State may question its corporate existence on the ground that the law was not followed."

■ There also exists an independent ground for the validity of the District. The 55th Legislature at its Regular Session in 1957 enacted in Ch. 310, Sec. 2, the following:

> "All organizational proceedings of water control and improvement districts, * * * wherein an election has been held for the confirmation of the district and a majority of those participating in the election voted in favor of the confirmation of the district, are hereby in all things validated, ratified and confirmed and the organization of such districts is hereby declared to have been accomplished and completed."

Hence, since there was a confirmation election held and since a majority of the voters favored the organization of the district, the Legislature thereby gave full validity to the District, regardless of its alleged infirmities.

Petitioners' next allegation is that there was no bond election. Art. 16, Sec. 59(c) of the Constitution of Texas requires that the Legislature shall not authorize the issuance of bonds by a district "* * * unless such proposition shall first be submitted to the qualified property tax-paying voters of such district and the proposition adopted." This provision is also incorporated into Art. 7880–9. Petitioners allege

there was no such election; because the constitution requires that an election be held, petitioners claim that the bonds are void; otherwise, their constitutional due process right would be abridged.

■ Petitioners overlook the fact that the Legislature has the power to determine how such bond elections shall be conducted and what body has jurisdiction to determine if the correct procedures have been followed or if there has been an election at all. Art. 16, Sec. 59 of the Texas Constitution provides:

> "The Legislature shall authorize all such indebtedness as may be necessary to provide all improvements and the maintenance thereof requisite to the achievement of the purposes of this amendment, and all such indebtedness may be evidenced by bonds of such conservation and reclamation districts, *to be issued under such regulations as amy [may] be prescribed by law * * *.*" [Emphasis added.]

The Legislative procedures concerning the election for the issuance of bonds are contained in Art. 7880 and, in brief, state:

(1) Whenever a district has been organized, has adopted a plan of improvements and has approved an engineer's report, then the directors of the District may order an election to authorize the issuance of bonds. (Art. 7880–78).

(2) The directors shall name the polling places and appoint election judges and clerks. (Art. 7880–27).

(3) Notice of such election shall be given by publishing the notice once a week for four consecutive weeks. (Art. 7880–80).

(4) The election officers shall prepare the returns in triplicate: one to be delivered to the District president, one to the District secretary and one retained by the election Judge. The directors shall canvass the election returns. (Art. 7880–29).

(5) Before such bonds are sold, a record of all proceedings of the issuance of the bonds shall be filed with the Attorney General who shall examine same and give his opinion thereon.

"When such record is approved said bonds shall be issued or duly executed and shall be submitted to the Attorney General for approval. If he shall find that same have been issued in accordance with the provisions of law and that such bonds are valid, binding obligations upon the district he shall so officially certify and execute a certificate thereof which shall be filed in the office of the State Comptroller and be recorded in a record kept for that purpose." (Art. 7880–34).

The parties have stipulated that the records of the District, on their face, show that all the statutory requirements had been met, including the notice of election, the holding of the election and the final approval by the Attorney General. The approval of the bond issue was given by the Attorney General on April 19, 1957.

▪ The bond issue procedures having been approved by the Attorney General and the bonds having been registered in the office of the State Comptroller on April 19, 1957, the petitioners are therefore precluded from questioning the validity of the bonds as a defense in this suit. Art. 7880–34 further provides:

"Such bonds after being approved [by the Attorney General] and registered [with the State Comptroller] shall be held in any suit or proceeding in which their validity may be questioned to be valid, binding obligations of such district, provided, however, that any party interested therein may file a suit thereon at any time prior to the registration of same by the State Comptroller, but not thereafter. Said bonds shall not be so registered in the office of the State Comptroller until twenty days after the date of the election authorizing the issuance thereof."

▪ The Legislature has herein delegated to the Attorney General the duty of determining the validity of the bonds which necessarily includes a determination of whether a bond election was held and such determination is conclusive unless the contestant files suit before the bonds are registered with the State Comptroller.

Art. 7880 provides only two methods for contesting a bond issue:

(1) Suit filed by the contestant prior to registration of the bonds with the State Comptroller. (Art. 7880–34).

(2) Quo warranto proceedings by the State of Texas, through the Attorney General upon his own motion or upon the motion of any other person if good cause is shown. (Art. 7880–25a).

These two methods are exclusive of all others. Since the petitioners did not follow the prescribed procedure for contesting the bond issue or bond election, they are thereby precluded from raising the "no election" defense in this suit. In Slater v. Ellis County Levee Improvement District No. 9, 120 Tex. 272, 36 S.W.2d 1014 (1931), the petitioners denied that there had been a legal issuance of bonds because there had been no legal election, although there may have been some form of an election wherein none of the voters nor election officials were qualified (in effect, no election was held for the qualified voters). The court said, "The remedy given by the statutes * * * for contesting elections of this character for irregularities or fraud is exclusive of all others."

Supporting the "no election" allegation, petitioners rely primarily on Miller v. State ex rel. Abney, 155 S.W.2d 1012 (Tex.Civ.App.1941) writ ref'd. However, this case is inapplicable here because petitioners here have not followed the proper procedure for contesting the election or for alleging that there was no election; whereas in the *Miller* case, the proper procedure was followed, that is, the suit was a quo warranto proceeding through the Attorney General provided for in Art. 7880–25a.

■ Petitioners next allege that they were not given proper notice of the bond election. The District gave notice by publication as required in Art. 7880–80. Petitioners claim that such notice by publication was insufficient, citing City of Houston v. Fore, 412 S.W.2d 35 (Tex.1967) and Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). These cases, however, involved beneficiaries of a special tax assessment based on benefit and beneficiaries of a trust, respectively, rather than persons subject to an ad valorem tax plan as the District here had adopted. The Court in the *Mullane* case admitted that "[p]ersonal service has not in all circumstances been regarded as indispensable to the process due to residents * * *." In City of Houston v. Fore, supra, this Court specifically limited the requirement of notice by mail to instances "* * * where the legislature, instead of prescribing an inflexible formula, authorizes an administrative determination of the lands benefitted and the amount of benefits accruing to each tract." The District's ad valorem tax plan is not such as is governed by the City of Houston v. Fore. Petitioners have not cited any cases, in this State or any other state, where it has been held that notice by publication was not sufficient notice for the holding of an election for the issuance of bonds which were to be paid through the levy of an ad valorem tax. We are unable to find such a case. Notice by publication is the universal method of notice for such a bond election. Therefore, we are not prepared to hold that failure to give personal notice violates the constitutionally required due process.

Hence, since petitioners have not followed the proper Legislative procedures for contesting the organization of the District and the bond election, they are therefore precluded from contesting same here. As a result, this Court need not consider the petitioners' other allegations, such as the inapplicability of estoppel by recital, the good faith test required for a holder in due course, etc.

The judgment of the Court of Civil Appeals is affirmed.

Dissenting opinion by POPE, J., in which SMITH and REAVLEY, J., join.

POPE, Justice (dissenting).

The prior dissenting opinion is withdrawn and this one is substituted for it. This court, in upholding the validity of the bonds sued upon, makes some basic errors. It holds that the owners of lands embraced in the Water District have no standing to challenge the validity of the bonds. It holds that the constitutional requirement for an election to authorize the issuance of bonds is inapplicable to a good-faith purchaser and that First State Bank is such a purchaser. It holds that the Legislature can override the constitutional requirement that a water district must conduct an election prior to the time it issues bonds. We shall assume that the Water District was validly created and organized.

The court has cut off the rights of the landowners, the Gueterslohs and McFalls, to question the validity of the bonds and has done this upon the basis of Article 7880–25a, Vernon's Tex.Civ.Stats. The court says that the landowners did not follow the prescribed procedure, that of a quo warranto proceeding, and they are thereby precluded from raising the defense that there was no election prior to the issuance of bonds. No party to this action has challenged the standing of the Gueterslohs and the McFalls to question the constitutionality of the bond issue. The plaintiff, First State Bank, as the adverse party, has not raised the issue. In fact, it was First State Bank that brought those landowners into this action by naming them as defendants. First State Bank alleged that they "are asserting, or attempting to assert, divers claims that the bonds sued on herein and the series of which they are a part, are invalid, and by such claims are attempting to impede and hinder the levy and collection of taxes for payment of the

bonds due the plaintiff. By reason whereof, a bona fide controversy exists between the plaintiff as bondholder and the group of property owning defendants mentioned in this paragraph as adverse parties, which dispute and controversy should be resolved in this action." The landowner defendants asserted in their answer that the Water District had failed to comply with the Constitution's requirement of an election. At that point, if the plaintiff bank was relying upon the lack of capacity of the landowners to invoke such a defense, it should have so pleaded affirmatively. Failing to do so it waived the contention. Rule 94, Tex.Rules Civ.Proc.

Plaintiff, First State Bank, did not plead that the landowners had failed to challenge the bond issue by quo warranto. It raised no such issue in its motion for summary judgment. The bank's brief in the court of civil appeals and its application to this court make no mention of the landowners' failure to proceed by quo warranto. The idea was first mentioned in this case by an amicus curiae brief filed in this court after the parties had completed their briefing. This court grounds its decision upon the failure of the attorney general to institute an action in quo warranto and treats the point in the same way we would a jurisdictional or fundamental error point. I would hold that the plaintiff bank, in choosing not to rely upon the point, has waived it. I do not consider the intrusion of this new theory, at so late a stage and at the behest of an amicus curiae and in a summary judgment proceeding, as procedurally fair.

The summary judgment should have been denied because a material fact issue existed as to whether the constitutionally required bond election was held. The Gueterslohs and McFalls produced proof at the summary judgment hearing that there never was a bond election. That proof must be taken as true in determining the correctness of the trial court's action in testing the summary judgment against them. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929 (1952). This proof was presented by agreement that the evidence heard in another trial could be considered in this case. There were only three qualified voters in the Water District. The election returns showed that there were three votes cast, and they all favored the issuance of the bonds and the levy of taxes to pay the bonds. The record on the summary judgment proceeding includes a certificate signed by the Secretary of the Board of Directors of the Water District which shows that the voters who voted on April 14, 1956 were "Mr. C. O. Rymer, Mrs. C. O. Rymer and Ronald E. Hewitt." Those three persons denied there was an election on April 14, 1956, or that they voted on that date.

There was an election to confirm the creation of the Water District on February 18, 1956 which was almost two months before the alleged bond election. Mrs. Rymer unequivocally denied her presence at or participation in any election other than the February election.[1] Mr. Rymer testified that he voted only at the election in February of 1956, not in the April bond

---

[1]. Q. Were you there in April of 1956 at an election?

A. No.
&ast; &ast; &ast; &ast; &ast;
Q. Now, Mrs. Rymer, if that is your signature on that page, and if that purports to be about an April election, when did you sign it, if you signed it?

A. Well, the only time I was over there was in February. We were supposed to vote for the Water District. That's the only time I ever signed any papers.

Q. All right. State whether or not you ever attended or participated in any election at which the Water District authorized the issuance of bonds?

A. That one time is the only time I ever voted.

Q. And what was the proposition you voted on that one time?

A. Well, we was supposed to vote on the Water District.

Q. Whether or not you would have a water district, or what?

A. Well, they were trying to get a water district over there, as I understand it.

election.[2] Mr. Hewitt, the only other qualified voter, testified that he was present during an election on a date which he could not fix with any certainty, but he said he did not vote in an election.[3] The record shows that Mr. and Mrs. Durbin were named as election clerks for the February 18 election and later were named as election clerks for the bond election on April 14, 1956. Durbin testified that he was present during the February election and acted as an election clerk. He said that he signed two sets of papers that were presented to him during the election in February, but he said he did not attend or witness any bond election which was purportedly held on April 14, 1956. Durbin, on cross-examination, was pressed to explain his signature on the bond election returns, dated in April. He answered by saying that he signed two documents on the night of February 18, the one about the February election as well as the one about the April election. A portion of the cross-examination is:

Q. And you say no evidences of an election during the month of April?

A. No.

Q. It all happened in February?

A. All happened in February.

Q. No question about it?

A. No question in my mind about it whatsoever.

Durbin's wife according to the Water District records was also named as a clerk for the two elections. She testified she was present in February, but not in April. She said that any documents she signed were signed on the night of February 18, 1956. She denied she participated in or witnessed any election during April that concerned voting for the issuance of bonds.

2. Q. All right, Mr. Rymer, did you ever vote out there in an election on any other occasion?

A. No, I never did.
   *      *      *      *      *
Q. Well, with respect to the Yoakum County Water Control and Improvement District No. 2, did you ever vote on any election, or in any election, other than this one in February for the Water District?

A. No, never did.
Q. Specifically, did you ever vote in any election in April?

A. No, never did.
Q. Of 1956?
A. Never did.
Q. Did you ever vote on whether or not the District would issue bonds?
A. No, not knowing about it.
   *      *      *      *      *
Q. All right. And did you ever sign any papers with respect to the District, other than on this night in February?
A. No, never did.
Q. If you signed this paper which you said you did, when did you sign it?
A. When I signed it the night of the election.
Q. In what month?
A. February.
   *      *      *      *      *

Q. Now, I don't want to try to confuse you about what the issues were or who was an election judge, all I want to know is, did you ever vote in an election in April of 1956 in connection with the Water Control District?
A. No sir, never did.
   *      *      *      *      *
Q. Did you, in February or April of 1956, or any other time, cast a vote, to your knowledge, relating to the issuance of bonds?
A. No sir, never did that I knowed about * * * anything about it.

3. A. That was the only one that I remember that I was present to, I didn't have nothing to do with it, just an onlooker.
Q. Did you ever vote in any election yourself?
A. No.
   *      *      *      *      *
A. No, if there was any election, it was that one. Of course, they—I don't even know whether they called it an election, but they was voting on something.
Q. And you didn't participate in that?
A. No.
Q. And you didn't participate in any other election?
A. No.

This summary judgment record by agreement of the parties includes the entire record and statement of facts in the case of E. F. Hutton & Company v. Yoakum County Water Control and Improvement District No. 2, which case is now pending in the Fifth Circuit of the United States, awaiting our decision. The first issue submitted to the jury in that case was: "Do you find from a preponderance of the evidence that an election was held within Yoakum County Water Control and Improvement District No. 2 in April, 1956 on the question of whether the Board of Directors of the District should be authorized to issue bonds of said District for the purpose of financing the construction of an irrigation system in the District?" The jury answered "No" and judgment was rendered accordingly.

In the face of a constitutional requirement for an election and the unanimous proofs, which we must accept as true, that there was no election, one seeks a reason for a decision which renders the constitutional requirement an empty one. The basis for the holding of the courts below is that the landowners are estopped to prove what they did prove—the absence of the election which the Constitution required. The majority opinion is silent on this issue.

The doctrine of estoppel by recital is a valid and good doctrine. Our question, however, is whether a good doctrine can uproot a plain requirement of the Constitution and can excuse an election when the Constitution requires one. Miller v. State ex rel. Abney, 155 S.W.2d 1012 (Tex.Civ. App.1941, writ ref.) by dicta, suggests the contrary result. That was a quo warranto case instituted by the Attorney General on the relation of twenty landowners in the Hidalgo County Water Control and Improvement District No. 2. The Water District, pursuant to an election, authorized the issuance of construction bonds in the principal sum of $5,550,000. Without an election, the Water District authorized the issuance of an additional $1,150,000 of interim bonds. The Water District's order and the bonds, as in our case, recited compliance with the law. The Attorney General certified his approval of the transcript of the record of all proceedings both of the organization of the Water District and the issuance of the bonds. The bonds were issued and approved and were registered with the Comptroller. Miller, the holder of some of the bonds, was not a holder in due course. The opinion of the court of civil appeals in Miller v. State was approved with the notation, writ refused. It discusses the constitutional mandate that an election must be the source of power to issue bonds. After quoting the constitutional requirement, the court wrote:

" * * * This inhibition is not only against the power of the Legislature to provide for any indebtedness against any such district, but it also prevents authorization for the issuance of any bonds unless the proposition upon which the bonds are to be issued shall first be adopted by the voters. Since the interim bonds in controversy were issued * * * without such proposition having been first submitted to the voters of the District for their adoption, we hold that said bonds are invalid and void because issued in violation of the plain provisions of the Constitution. * * *

"Appellants assert that because the bonds in controversy were approved by a former Attorney General, registered by the Comptroller, and purchased by them on the open market, Article 7880–34 of Vernon's Civil Statutes requires judgment decreeing the same to be valid. We are in full accord with the sound public policy which doubtless prompted the enactment of this article of the statutes. It may be that by reason thereof the relators herein would be cut off from the right to maintain this suit in their individual capacities, although in view of the provisions of Articles 715 and 8010 of said Statutes *we doubt whether any in-*

*terested citizen would be deprived of his right to question the validity of the bonds in controversy on fraudulent or constitutional grounds. * * *.*" (Emphasis added)

In Miller v. State, there is also discussion of the effect of certain validating acts by the Legislature. The court held that an election was an essential constitutional requirement which must precede the issuance of the bonds, saying: "But if it was the legislative intent that any of the cited statutes should be construed as contended for by appellants, then it is fundamental that no act of the Attorney General or of the Comptroller, or indeed of the Legislature itself, could give validity to that which is expressly prohibited by the Constitution."

Miller v. State struck down a bond issue of a Water District which in fact had conducted no election. It did this in the face of the perfect bond transcript of the Water District's records and the Attorney General's approval. It did this after the Comptroller had registered the bonds and after the Legislature had passed a special act validating the bond issue. Despite all of these steps, the court held that a constitutional condition precedent could not be excused on principles of estoppel or by the acts of the Legislature itself.

If the executive and legislative branches of the government can not rise above this constitutional limitation upon powers to issue bonds, I fail to see how the doctrine of estoppel by recital can. It is no answer to state the beneficial purposes of that doctrine in protecting bondholders and in maintaining confidence in the bond market. The Constitution made an express choice between those it desired to protect. It did this in only one narrow area. It says, in effect, that the doctrine of estoppel by recital may operate except in the situation in which no election at all was conducted. This means that the Constitution, in that instance, declares it is better to protect the taxpayer than the bondholder.

Miller v. State was a quo warranto proceeding, but as already discussed, the plaintiff, First State Bank, has not contended in these proceedings that the landowners lacked standing to challenge the bonds and has waived any such contention. It might also be thought that the case is distinguishable since the holder of the bonds in that case was not a good-faith purchaser. It is more or less assumed by the courts below that First State Bank was a good-faith purchaser, but the record does not support this assumption.

Estoppel by recital did not operate against the landowners because the plaintiff bank did not show as a matter of law that it was a good-faith purchaser. One's good faith is ordinarily a question of fact, and we have held that "bad faith may be shown by a wilful disregard of and refusal to learn the facts when available and at hand." Citizens Bridge Co. v. Guerra, 152 Tex. 361, 258 S.W.2d 64 (1953). In Miller v. State, the doctrine of estoppel by recital was not operative because the bondholder was not a good-faith purchaser.

This court has assumed that the bank in this case is a good-faith purchaser, but that is a material fact issue which should be resolved upon trial. James F. Smith was President of the Amarillo Savings & Loan Association when it authorized H. L. Shaffer to purchase the bonds. There is a fact issue concerning Shaffer's agency. Smith was also President of First State Bank at the time Shaffer made the purchase for Amarillo Savings and when it transferred the bonds to First State Bank. There is proof that either Shaffer or Smith, or both, at all relevant times showed a wilful disregard of facts which they knew or which were readily at hand. Those facts are that the Water District embraced only seven sections of land, three of those sections were not tillable, three were not irrigable, only one section was in cultivation in 1959 but the bond circulars repre-

sented that 6,000 acres would be in cultivation by 1958, the District would charge for water which meant the District must own the water, the seven sections without water rights were assessed at $939,000 in 1959, it was impossible for sandy land to be worth that much when the landowners owned no water rights, the District had collected no taxes for the first three years which violated Article 7880–90, the seven sections would need to produce taxes to pay off the sum of $513,135 which was the projected amount to be spent on irrigation wells and equipment, and the bond election authorized the issuance of bonds in the sum of $787,500 which would impose a debt of eighty-six per cent of the land value. Under this record, we can not say, as a matter of law that the purchaser of the bonds was a good-faith purchaser.

I would hold without regard to the good-faith issue that bonds which are issued in contravention of the express requirement of Article 16, Section 59(c) of the Texas Constitution are wholly void and subject to collateral attack, as the rule has been formerly applied. City of Brenham v. German American Bank, 144 U.S. 173, 12 S.Ct. 559, 36 L.Ed. 390 (1892); Miller v. State ex rel. Abney, 155 S.W.2d 1012, 1017 (Tex.Civ.App.1941, writ ref.); Deason v. Orange County Water Control & Improvement Dist. No. One, 151 Tex. 29, 244 S.W. 2d 981 (1952); Grimes County v. W. L. Slayton & Co., 262 S.W. 209 (Tex.Civ. App.1924, writ ref.); Texas Agr. Ass'n v. Hidalgo County W. C. & Imp. District No. 1, 125 F.2d 829 (5th Cir. 1942); Shelby County v. Provident Savings Bank & Trust Co., 54 F.2d 602 (5th Cir. 1932). A collateral attack is permissible to establish that the bonds are void. Walling v. North Central Texas Municipal Water Authority, 162 Tex. 527, 348 S.W.2d 532 (1961); Parks v. West, 102 Tex. 11, 111 S.W. 726 (1908). I find it impossible to square our holding in Walling with the holding in this case. In Walling we relied upon and quoted from

Parks v. West, 102 Tex. 11, 111 S.W. 726 (1908) wherein this court held:

" ' * * * the attack of the plaintiffs is not merely upon the corporate existence of the district, but is directed against the power of the defendants to lay burdens on their property and subject them to the payment of taxes. Surely they have the right to do that although the reason they assign for the lack of power may also go to the right of the district to exist under the Constitution. *Certainly a property holder has the right to say to the court that he is protected by the Constitution from the imposition of a tax by persons to whom the Constitution, in effect, denies such power.*' " (Emphasis supplied)

These cases correctly held that powers denied by the Constitution should not be permitted by decision. See Peck v. Hempstead, 27 Tex.Civ.App. 80, 65 S.W. 653 (1901, writ ref.). We have also enforced legislative limitations upon powers of municipalities to act by holding excessive exercises of powers "utterly void because not authorized by law or color of law." We have permitted collateral attacks upon void municipal acts and by private citizens without resort to quo warranto. Deacon v. City of Euless, 405 S.W.2d 59 (Tex.Sup.1966).

The third error, that of ignoring the constitutional requirement for an election, arises out of the court's failure to consider Article 7880–25a in its entirety. The court has held that the statute states two exclusive remedies which a complaining landowner must pursue to question a bond issue. The court says that the landowner must either (1) sue before the bonds are registered or (2) proceed by quo warranto. Article 7880–25a is also cited in support of the court's conclusion. The court quotes a portion of the statute, which standing alone, would support the holding. The court does not quote the remaining and controlling part of the same article. I find

it difficult to read out of the statute these words which the majority opinion ignores:

"* * * except in such cases as are, or may be, provided by * * *, or by the Constitution of Texas."

I would hold that the Legislature has not cut off the landowners' constitutional rights by limiting them to two designated procedures, since the statute expressly excepts their right to invoke any other constitutional limitation upon the powers of the one issuing the bonds. I would hold that the Legislature did not intend and does not possess the power to validate an unconstitutional bond issue. Hedges v. Dixon County, 150 U.S. 182, 14 S.Ct. 71, 37 L.Ed. 1044 (1893); State v. Town of Belleair, 170 So. 434 (Fla.1936); Village of Heyburn v. Security Savings & Trust Co., 55 Idaho 732, 49 P.2d 258 (1935). In Hedges, supra, the United States Supreme Court said:

"Again, the constitution of the state having prescribed the amount which the county might donate to a railroad company, that provision operated as an absolute limitation upon the power of the county to exceed that amount; and it is well settled that no recitals in the bonds, or endorsed thereon, could estop the county from setting up their invalidity, based upon a want of constitutional authority to issue the same. *Recitals in bonds issued under legislative authority may estop the municipality from disputing their authority, as against a bona fide holder for value; but, when the municipal bonds are issued in violation of a constitutional provision, no such estoppel can arise by reason of any recitals contained in the bonds.*" (Emphasis supplied)

I would reverse the judgment of the courts below and remand this case for trial upon the merits.

SMITH and REAVLEY, JJ., join in this dissent.